IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| TAYLOR WAGONER,           )<br>                                                  )<br>        Plaintiff,                          )<br>                                                  )   Case No. 4:16-cv-00312-JAR<br>vs.                                           )<br>                                                  )<br>STATE FARM MUTUAL AUTOMOBILE )<br>INSURANCE COMPANY,           )<br>                                                  )<br>        Defendant.                      ) | |

# PLAINTIFF TAYLOR WAGONER'S
# TRIAL BRIEF

## Preliminary Statement

As part of her Pre-Trial Compliance in this suit against State Farm Mutual Automobile Insurance Company ("State Farm") for Breach of Contract (Amended Complaint, [Doc. 22] Count I) and Vexatious Refusal to Pay Claim (Id., Count II), Plaintiff Taylor Wagoner ("Ms. Wagoner") has submitted with this court various filings presenting various legal issues before the court, including four Motions in Limine (Docs. 48-51), Responses to State Farm's Motions in Limine (Doc. 55), and proposed Jury Instructions (Doc. 52).*

Ms. Wagoner comes now and presents the court with this Trial Brief, in which she summarizes the expected evidence, including as it relates to the underlying occurrence and claims handling by State Farm. This is followed by a Discussion of Law, which focuses on Ms. Wagoner's theories of liability, issues of sufficiency of evidence and thus submissibility of State Farm's pleaded affirmative defenses.

---

\* *See also*, Doc. 54: Motion for Court to Determine Amounts of Statutory Damages and Attorney's Fees in Event Jury Finds Liability Against State Farm for Vexatious Refusal to Pay Claim.

**CASE OVERVIEW**

1.   *The pile-up is caused by ladder laying across Right Lane of Southbound US 61*

➢   Two-vehicle Collision on southbound US 61 in St. Charles County. This case arises out of a two-vehicle collision which occurred on southbound US 61 in St. Charles County in the early evening of February 6, 2015 – a Friday. As described below the pile-up was caused by a ladder lying across roadway of the righthand, southbound lane.

➢   Three eyewitnesses. There are three known eyewitnesses to the events leading to the crash. All were motorists operating their vehicles in the southbound lanes.

- **Susan Lewis**, *encountered ladder across right-lane lane, sought to get into left-hand lane.* Susan Lewis was driving a gray 2014 Ford Escape in the right-hand southbound lane before the collision. The vehicle in front of her changed lanes from the right-hand lane revealing a ladder laying the righthand lane. Ms. Lewis says she was 50 yards away when she first saw the ladder. Her "last thought" before the collision was to '*get into the left lane*." She does not remember the crash.

- **Plaintiff Taylor Wagoner**, *driving in left-hand lane; crashes into back of Susan Lewis vehicle.* Taylor Wagoner was driving a white 2013 Ford Fusion in the left-hand lane before the collision. "The last thing I saw was brake lights in front of me, tried to stop, and my air bag hit me and that's it."

- **Kelly Cullen-Pack**, *driving a vehicle in left-hand lane behind Taylor Wagoner vehicle.* Kelly Cullen-Pack was driving her car behind Ms. Wagoner's car in left-hand lane of southbound US 61 before the collision. She said Ms. Wagoner's car was traveling 60 mph to 65 mph in the left-hand lane, in the flow of traffic. Ms. Cullen-Pack witnessed the crash

occur in the left-hand lane. After the collision, Ms. Cullen-Pack sought to assist Ms. Wagoner and walked through accident debris in the left-hand lane.

2. ***EMS report notes that a vehicle "pulled in front" of Ms. Wagoner***

➢ St. Charles County Ambulance District Patient Care Report "narrative" notes vehicle pulled in front of Taylor Wagoner. The narrative section of the Ambulance District's Patient Care Report notes that Ms. Wagoner "appears unconscious with blood coming from her mouth … It was reported that [patient] was traveling approx. 60-65 mph when second vehicle pulled in front of her vehicle and they collided." The report does not note the source of the observation about the second vehicle.

3. ***The Missouri Uniform Crash Report & Trooper Paul Long***

➢ Trooper Paul Long prepared crash report, but was not eyewitness to crash. Trooper Paul Long responded to the collision and prepared a Missouri Uniform Crash Report (the "Crash Report"). Trooper Long reported that the crash occurred at 5:20 p.m., that he was notified of the crash at 5:25 p.m., and that he arrived at the scene at 5:47 p.m.

➢ Trooper Paul Long observed ladder at scene, concluded it was contributing cause of crash. Trooper Paul Long observed a ladder at the crash scene; he believed the ladder was lying across the righthand lane at the time of the crash, and that was a contributing cause of the crash.

➢ Trooper Paul Long took statements of Susan Lewis and Taylor Wagoner. Trooper Paul Long took statements of Susan Lewis and Taylor Wagoner.

- **Susan Lewis**, he reported, told him: "I kinda (*sic*) remember a ladder and that's it."
- **Taylor Wagoner**, he reported, told him: "I think I was in the left lane. Probably doing 75 and a black car cut across the road in front of me and I just hit the brakes and I went off the road.

3

I kept hitting the brakes but I couldn't stop and I kept going toward other side of the road."

➢ <u>Trooper Paul Long did not identify or interview independent eye-witness Kelly Cullen-Pack</u>. The crash report prepared by Trooper Long deduced that the collision had occurred not in the left-hand lane but in the right-hand lane. No witness told Trooper Long that the crash occurred in the right-hand lane. The crash report does not cite evidence relied on in support of the conclusion that the crash occurred in the right-hand lane. Trooper Paul Long did not have the benefit of the independent eyewitness observations of Kelly Cullen-Pack that, prior to the crash, Taylor Wagoner's vehicle was in the left-hand lane and the crash occurred in the left-hand lane.

➢ <u>Trooper Paul Long was not endorsed by State Farm as Expert Witness.</u> The crash report – through checked boxes – indicates Trooper Paul Long deduced as "probable contributing circumstances" of that crash that Taylor Wagoner's vehicle had been traveling at an excessive rate of speed and had been "following too close." The crash report does not cite evidence relied on in support of those conclusions. There is no reporting of expert protocols having been employed to determine causation or explaining how these conclusions were derived. State Farm did not endorse or otherwise disclose Trooper Paul Long as an expert witness.

**3.     Plaintiff Taylor Wagoner's injuries.**

➢     *Plaintiff Taylor Wagoner was medically diagnosed as having, and has been treated for, the following injuries and conditions as a result of the collision:* Right Hand Fracture, Right, Acute Neck Sprain, Epistaxis, Concussion, Contusion of Hip, Strain of Abdominal Muscle, Strain of Left Shoulder, Strain of Left Elbow, Chest Wall Contusion, Headaches, Thoracic Back Tenderness, Lumbar Back Tenderness, Abrasion to Anterior Superior Iliac Crest, Closed Head Injury.

4.      ***Defendant State Farm's Uninsured Motor Vehicle Coverage and claims handling***

➢      <u>*State Farm Policies and Uninsured Motor Vehicle coverages are undisputed*</u>. State Farm Mutual Automobile Insurance Companies issued five policies of insurance that are relevant to this action: One to Taylor Wagoner and four to her father, Doug Wagoner. The coverage for Uninsured Motor Vehicle liability, and the terms of that coverage, and the $175,000 limits of liability in Uninsured Motor Vehicle coverage under the policy are undisputed in this case.

➢      <u>No State Farm claim handler investigated, considered or recommended denial of Plaintiff Taylor Wagoner's Uninsured Motor Vehicle Claim</u>. Plaintiff Taylor Wagoner submitted to State Farm her Uninsured Motor Vehicle Claim in August 2015. State Farm didn't open a claim or assign a claims handler to investigate or make a liability determination. No State Farm claims handler even read the letter, medical records, and other material sent by Ms. Wagoner in support of her claim. Rather, State Farm denied the Claim, in its entirety, in September 2015. State Farm's denial was based on a mistaken belief a liability determination on Uninsured Motor Vehicle coverage already had been made in April 2015, when in fact it had not.

➢      <u>State Farm failed to make even the most basic inquiries into facts of the Crash</u>. State Farm did not take a recorded statement of any of the three eye-witnesses to the crash. State Farm did not interview Trooper Paul Long. State Farm did not record in its claim file that Trooper Paul Long considered the ladder a contributing cause of the crash. Trooper Long reported that Taylor Wagoner told him she was in the left lane and that another vehicle cut her off. State Farm did not investigate whether there were any eye-witnesses to the crash other than Susan Lewis and Taylor Wagoner. State Farm would have learned about eye-witness Kelly Cullen-Pack had it interviewed Taylor Wagoner. But State Farm never interviewed its insured Taylor Wagoner.

5

## DISCUSSSION OF LAW

### I.  Ms. Wagoner will make a submissible case for Per Se Negligence against the owner or driver of an uninsured motor vehicle

The Insuring Agreement under the State Farm policies' uninsured motor vehicle coverage provides that State Farm "will pay compensatory damages for bodily injury an insured is legally entitled to recover from the owner or driver of an uninsured motor vehicle," provided the "bodily injury" is "caused by an accident that involves the operation, maintenance, or use of an uninsured motor vehicle as a motor vehicle."

The definition of an "uninsured motor vehicle" includes motor vehicles "the owner and driver of which remain unknown and which causes bodily injury to the insured."

Ms. Wagoner pleaded and the evidence will show that Ms. Wagoner was injured because a ladder dropped off a vehicle, the owner and driver of which remain unknown, across the right-hand lane of southbound US 61. The ladder, in turn, caused Ms. Lewis to swerve from the right-hand lane into the left-hand lane in which Ms. Wagoner was operating her vehicle. As a result, the two vehicles collided and Ms. Wagoner suffered serious bodily injury.

Under Missouri law, "the operator of a motor vehicle is presumed to be responsible for the safety of any load being hauled by the vehicle." *Pfoutz v. State Farm Mut. Auto. Ins. Co*., 861 F.2d 527, 530 (8th Cir. 1988).  In *Pfoutz*, a motorist was injured when the automobile she was operating struck the head of a diesel engine that was lying in a traffic lane of a heavily traveled highway in St. Charles County. There was no direct evidence of how the engine part ended up in the roadway or of the identity of the engine part's owner. The injured driver sued State Farm under her uninsured motor vehicle coverage, alleging that "her injury resulted from the negligent operation of an unidentified motor vehicle." *Id.* at 527.

6

The trial court granted summary judgement in favor of State Farm, concluding that the jury "could only speculate as to whether the occurrence was caused by negligence." *Id*.

The Eighth Circuit Court of Appeals reversed. It held that "the facts and circumstances surrounding the accident raise a reasonable inference that a motor vehicle was hauling the engine head when it fell onto the freeway. Similarly, the very fact that a 200-pound engine head suddenly appeared in the middle of a major freeway provides sufficient evidence for a jury to conclude that someone must have been negligent. Finally, under the *res ipsa* doctrine and an applicable Missouri motor vehicle statute, the circumstances of this accident would allow a jury to infer that the negligence involved was that of the hauling vehicle's owner operator." Id. at 530.

The motor vehicle statute, R.S.Mo. §307.010, cited by the court in *Pfoutz,* provides that "[a]ll motor vehicles … operating upon the public highways … and carrying goods or material … which may reasonably be expected to become dislodged and fall from the vehicle . . . as a result of air pressure and/or by movement of the vehicle … shall … be sufficiently secured so that no portion of such goods or material can become dislodged and fall from the vehicle while being transported or carried."

Under R.S.Mo. §307.010, the "driver of the unidentified vehicle was responsible for making sure the diesel engine head was secured. The fact that the engine head fell onto the freeway clearly shows that it was not adequately secured. Therefore, the driver was operating the motor vehicle in violation of Missouri law." Pfoutz, supra, 861 F.2d at 530.

Ms. Wagoner's two car pile-up indisputably was caused by a ladder lying across the right-hand lane of the highway. This gives rise to the inference determined in *Pfoutz* to be

7

reasonable as a matter of law: The ladder had been transported by an unidentified vehicle and dropped to the roadway as a result of the negligence of the vehicle owner or operator; proof of negligence is established by the apparent violation of R.S.Mo. §307.010, which requires vehicle operators to secure loads.

Ms. Wagoner pleadings and evidence support the case's submission on a theory of *Per Se* Negligence. When, as in this case, the (a) violation of a penal statute has been pleaded by the plaintiff as the standard of care, and (b) that statue is intended to protect persons, property or promote public safety, and (c) the plaintiff is in the class of persons intended to be protected, and (d) there is evidence to support a jury determination that the statute was violated then the jury, in determining negligence, should be instructed to determine the existence of facts constituting a violation of the statue. The jury need not additionally determine whether that conduct was negligent, because violation of the statute is *per se* negligence.

In *King v. Morgan*, 873 S.W.2d 272 (Mo. App. 1994), for example, surveyors were working on a roadway shoulder when they were struck by overwide cargo on a tractor-trailer – allegedly in violation of a statute that imposed criminal sanction against operators of vehicles the width of whose load exceeds 96 inches. The load in question – a bulldozer -- was 132 inches. The plaintiff sought to submit the case on per se negligence – seeking jury determination of liability based per se on the load width exceeding the maximum width permitted under the penal statute. *Id*. at 275.

The trial court declined to so instruct the jury. The appellate court reversed, determining that the penal statute in question had been enacted to promote highway safety, and that the plaintiff – a member of the public – was in the class of persons the statute was designed to

protect. *Id.* at 275-76. The court further found that per se negligence was established by evidence the tractor-trailer operator was carrying a load whose width violated the statute. Id. at 276-77. Finally, the court concluded that there was sufficient evidence for a jury to conclude that the plaintiff's injuries were proximately caused by the violation of the statute limiting the width of loads, and the injuries he suffered were of the kind the statute sought to prevent. *Id*. at 277-78.

*Rains v. Herrell*, 950 S.W.2d 585 (Mo. App. 1997) demonstrates the difference between a verdict-directing instruction submitted under ordinary negligence with one submitted for negligence per se. In *Rains*, the plaintiff was injured when his vehicle collided with the defendant's vehicle. Defendant had been operating his vehicle on the wrong side of the road, in violation of a penal statute. The plaintiff sought the following, negligence *per se* instruction:

> *Your verdict must be for the plaintiff James Thomas Rains if you believe:*
>
> *First, defendant's automobile was on the wrong side of the road, and*
>
> *Second, as a direct result of such conduct, plaintiff James Thomas Rains sustained damage(s).*

Instead, the court gave the following negligence instruction:

> *Your verdict must be for plaintiff James Thomas Rains if you believe:*
>
> *First, defendant's automobile was on the wrong side of the road, and*
>
> *Second, defendant was thereby negligent, and*
>
> *Third as a direct result of such negligence, plaintiff James Thomas Rains sustained damage.*
>
> *The term "negligent" or "negligence" as used in this instruction means the failure to use that degree of care that a very care and prudent person would use under the same or similar circumstances.*

9

The per se negligence instruction submitted by the plaintiff asks the jury simply to determine the facts underlying whether the safety related penal statute had been violated – i.e. was defendant's automobile "on the wrong side of the road." Under per se negligence the element that "defendant was thereby negligent" is superfluous. The facts giving rise to the claimed violation, *per se*, constitutes negligence. *Id*. at 587-88.

The appellate court determined the trial court had erred in not giving the per se negligence instruction because the plaintiff's "petition pleaded an action for negligence per se and there was evidence to support submission … on that basis." *Id*. at 588.

Here, as in *Rains*, Ms. Wagoner properly pleaded an action for negligence per se and there will be evidence to support submission on that basis.

The purpose of R.S.Mo. §307.010, which was pleaded by Ms. Wagoner, "is to promote public safety, to prevent accidents on roadways by requiring loads to be securely fastened." *Pfoutz,* 861 F.2d at 530 (8th Cir. 1988).* On the facts and circumstances of this case, the per se negligence instruction to the jury based on violation of R.S.Mo. §307.010 should be:

> *Your verdict must be for Plaintiff on her claims for actual damages, if the you believe:*
>
> *First**,** a ladder was lying in the southbound traffic lane of U.S. Highway 61,* and
>
> *Second, the ladder either directly caused or directly contributed to cause damage to Plaintiff.*

---

* See also, *Goudeaux v. Board of Police Commissioners*, 409 S.W.3d 508, 517-18 (Mo. App. 2013) ("[V]iolation of a safety statute creates a presumption of negligence," and "[w]hen a party is shown to have violated a duty or fixed standard created by a statute or ordinance a prima facie case of negligence or contributory negligence is made for the jury and that party must show legal justification or excuse for failure to comply with the statute or ordinance."); *Burns v. Frontier II Properties*, 106 S.W.3d 1, 3-4 (Mo. App. 2003)("When a case based on negligence per se is submitted to the jury, the standard of care is omitted because the statutory violation itself constitutes a breach of the standard of care."); *Condos v. Associated Transports, Inc*., 453 S.W.2d 682, 686 (Mo. App. 1970)("The fact that the parties present conflicting and divergent theories of the matter in which the collision occurred does not preclude one injured by violation of the statute from relying upon negligence per se.")

## II. Ms. Wagoner will make a submissible case for Vexatious Refusal to Pay Claim

Missouri law long has provided a statutory cause of action for vexatious refusal to pay a claim, which applies "[i]n any action against an insurance company to recover the amount of any loss under a policy of automobile … insurance, if it appears from the evidence that such company *has refused to pay such a loss without reasonable cause or excuse*." R.S.Mo. §375.420 (emphasis added).

When such liability is found, "the court or jury may, in addition to the amount [of such a loss] and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee." *Id.*   *See generally*, Fusner, *Overview of Bad Faith Litigation in Missouri*, 62 Missouri L.Rev. 807 (1997) ("Bad Faith Overview").

The cause of action applies to actions against insurance companies for refusal to pay Uninsured Motor Vehicle claims, and the elements of proof are that (1) the insured had such an insurance policy, (2) the insurance company refused to pay, and (3) the refusal was without reasonable cause or excuse. *Dyne v. State Farm Fire and Casualty Co.*, 188 S.W.3d 454, 457-58 (Mo. 2006).

"Missouri courts recognize that claims of vexatious refusal to pay arise in innumerable contexts," and "direct and specific evidence of vexatious refusal to pay is not required." *Id.* at 458. "The adequacy of an insurer's investigation of a claim may be considered evidence of vexatiousness." *Allen v State Farm Mutual Automobile Ins. Co.*, 753 S.W.2d 616, 620 (Mo. App. 1988). *See D.R. Sherry Constr., Ltd. v. American Family Ins. Co.*, 316 S.W.3d 899, 907 (Mo. 2010); *Stark Liquidation Co. v. Florists Mutual Ins. Co.*, 243 S.W.3d 385, 401 (Mo. App. 2007).

11

Here the evidence of State Farm's claims handing and denial of Ms. Wagoner's claim demonstrates a willful failure by State Farm to investigate and a staggering absence of diligence in determining the claim.

No State Farm claims handler investigated, considered and recommended denial of the Uninsured Motorist Claim Ms. Wagoner made in August 2015. State Farm denied Ms. Wagoner's claim because it believed – mistakenly – a liability decision *already* had been made months earlier on the Uninsured Motorist Claim. In fact, no such determination ever had been made. No State Farm claims handler ever had been assigned to evaluate Uninsured Motorist liability. No claims handler actually had made a liability determination on Ms. Wagoner's Uninsured Motorist Claim.

### A.     *Graham Testimony*

Bobbie Graham was the Independent Adjuster who informed Ms. Wagoner that State Farm had denied her Uninsured Motorist Claim. She did so by letter dated September 17, 2015, addressed to Ms. Wagoner's legal counsel, stating "We have carefully investigated the facts and circumstances related to this loss. Our investigation indicated that our insured [Ms. Wagoner] was legally liable; therefore, we must respectfully deny Taylor Wagoner's claim for Uninsured Motorist." Dep. of Bobbie Graham, ("Graham Dep.") Tr. at 18, 26-27 (excerpts and letter appended to Motion in Limine to Exclude Evidence Purportedly Probative of "Reasonable" Claims Handling, Doc. 48, as Motion Ex. A).

When asked "who performed the investigation that you referred to in the letter," Ms. Graham pointed to State Farm claims handler "Amanda Klein" (*Id*. at 27). She said Ms. Klein had "established liability" back on April 14, 2015. *Id*. at 15. All Ms. Graham did to prepare the

12

denial letter was "review the investigation and the analysis that was performed by Amanda Klein." *Id*. at 16-17. Specifically, Ms. Graham was asked:

Q:  Do you know of any other people who participated in the evaluation of liability of this case other than Amanda Klein?

A:  From what I see here in the file notes, I believe that Amanda Klein was the only handler at the time that investigated to make that decision. I don't see any other representatives making contact for the investigation.

Q:  The work that Amanda Klein did in the [Claims Review Team] unit, is that the type of work that you also performed for State Farm as an independent contractor?

A:  Not at this time when I was in this claim file, no. (*Id*.)

Ms. Graham wrote the letter the day she was assigned the file. *Id*. at 13-14. Her understanding of the scope of work performed by Ms. Klein was in error.

**B.    *Klein Testimony***

Ms. Klein investigated the accident and evaluated issues of liability in April 2015 but only on issues of *property damage*. Dep. Tr. of Amanda Klein ("Klein Dep.") at 20 (excerpts appended to Motion in Limine to Exclude Evidence Purportedly Probative of "Reasonable" Claims Handling, Doc. 48, as Motion Ex. B). She did *not* conduct any analysis of liability on Ms. Wagoner's Uninsured Motorist Claim, which had not even been submitted to State Farm until months later. Specifically, Ms. Klein was asked (*Id*.):

Q:  "In your analysis of liability, where you considering the liability of – were you considering uninsured-motorist liability as part of the work in this case?"

A:  No.

13

Ms. Klein understood that "other people would be working on this file concerning the claims of Susan Lewis and Taylor Wagoner." Klein Dep. at 34. Ms. Klein completed her work on the file in April 2015. (Klein Dep. at 66). Ms. Wagoner, meanwhile, didn't submit her claim for bodily injury under Uninsured Motorist coverage until more than four months later, and did so by letter August 24, 2015. *See* Dep. Tr. of Billie Dale Robinson ("Robinson Dep.") at 40-44. & Ex. 2 (excerpts and letter appended to Motion in Limine to Exclude Evidence Purportedly Probative of "Reasonable" Claims Handling, Doc. 48, as Motion Ex. C); Graham Dep. at 67.

C.   **Robinson Testimony**

When Ms. Wagoner made her demand in August 2015, the claim file had been assigned to State Farm claims handler Billie Dale Robinson. Mr. Robinson never read or analyzed Ms. Wagoner's letter or claim under the uninsured motorist coverage. Robinson Dep. at 40-43. That's because he had not been assigned to do so.

Mr. Robinson testified that he had been "hired to handle bodily injury claims only." *Id.* at 23-24. "I was not to get into liability decisions," he said. *Id.* He, too, labored under the mistaken belief Ms. Klein had made a liability determination on Uninsured Motorist Coverage in April 2015 and that's why State Farm did not consider Ms. Wagoner's Uninsured Motorist Claim when it was submitted in August: "No uninsured motorist claim had been opened. So, there was no adjuster assigned," he said. *Id.* at 51.

State Farm's Answers to Plaintiff's First Interrogatories to Defendant identify just two persons as having investigated the "facts of the loss" – Amanda Klein and Billy Robinson (and not Ms. Graham). Answers to Plaintiff's First Interrogatories to Defendant, Nos. 6 & 8, appended hereto as Motion Ex. D.

14

State Farm may try to suggest it relied on various kinds of evidence when denying Ms. Wagoner's Uninsured Motorist Claim. Such evidence should be excluded because State Farm (a) denied Ms. Wagoner's Uninsured Motorist Claim based on a mistaken belief a liability determination on Uninsured Motorist coverage already had been made in April 2015 and (b) never opened a claim or assigned a claims handler to investigate or make a liability determination on Ms. Wagoner's Uninsured Motorist Claim after it was submitted in August 2015.

D.      **State Farm's failure to otherwise undertake basic investigation.**

In addition to this tragic-comedy of error and neglect, State Farm failed to collect even basic facts underlying Ms. Wagoner's uninsured motor vehicle claim.

There is no evidence that a State Farm claims handler ever read the letter, medical records, and other material sent in August 2015 by Ms. Wagoner to submit her claim.

State Farm did not take a recorded statement of any of the three eye-witnesses to the crash. State Farm did not interview Trooper Paul Long. State Farm did not record in its claim file that Trooper Paul Long considered the ladder lying across the southbound lane a contributing cause of the crash. State Farm did not investigate whether there were any eye-witnesses to the crash other than Susan Lewis and Taylor Wagoner. State Farm did not record the existence of independent eye-witness Kelly Cullen-Pack in its claim file. State Farm could have learned about the existence of independent eye-witness Kelly Cullen-Pack had it interviewed Taylor Wagoner. But State Farm never interviewed its insured Taylor Wagoner.

### III. As a matter of law, State Farm lacks Sufficient Facts to Support Submission of Affirmative Defenses to Jury

State Farm, in its Answer and Affirmative Defenses, alleges that Ms. Wagoner "in one or more of the following ways" was negligent in: failing to keep a careful lookout; driving at a speed too fast for the conditions in and there existing; failing to keep an adequate distance between her vehicle and the vehicle in front of her in order to stop; failing to slow, stop and swerve in time to avoid the collision; and because "the front of [her] vehicle came into contact with the rear of another vehicle." Answer First Amend. Complaint, Aff. Def. ¶1(a)-(e).

State Farm further asserts in its Answer and Affirmative Defenses that "any recovery by Plaintiff should be reduced in proportion to Plaintiff's comparative fault and negligence which contributed to cause any injury she may sustain." *Id*.

Ms. Wagoner anticipates State Farm may seek to inform the jury – in voir dire, as part of State Farm's opening statement, and during presentation of evidence – of certain assertions and alleged statements, mainly contained in the Missouri Uniform Crash Report (PLTF-7) (the "Crash Report") and or through the testimony at trial of the Crash Report's author by Trooper Paul Long ("Trooper") that Ms. Wagoner drove her vehicle at a speed in excess of the speed limit, followed too close, and failed to observe another vehicle. Such assertions – most of which are inadmissible opinions without evidentiary support – are expected to be offered as proof purportedly probative of contributory fault.

The legal sufficiency of affirmative defenses of the kind asserted by State Farm depend on the proponents' ability to present admissible evidence of causation. Ms. Wagoner anticipates State Farm will be unable to offer sufficient evidence of *any* kind demonstrating causation.

16

It is not enough for the proponent of affirmative defenses such as those advanced by State Farm to suggest a driver may have been driving in excess of the speed limit, or to show the automobile she was driving struck the rear end of another vehicle, or the driver did not slow, stop or swerve prior to the collision. The evidence also must show that the driver's act, or failure to act, made a difference, that it contributed to the accident or injuries, or that, but for the conduct, the accident would not have happened or would have happened differently.

Thus, for example, Missouri Courts have held that "excessive speed is not the proximate cause of a motor vehicle collision unless it prevents the operator from avoiding the accident; hence it must be shown that the collision would not have occurred except for the excessive speed shown by the evidence." *Roper v. Archibald*, 680 S.W.2d 743, 748 (Mo. App. 1984).

For the same reasons, under Missouri's "rear-end doctrine," evidence of a rear-end collision does not give rise to an inference of negligence absent proof of "the time and distance available to the overtaking vehicle." *Lichtenberg v. Hug*, 481 S.W.2d 527, 529 (Mo. App. 1972). Similarly, when a defense is based on a driver's alleged failure to keep a "careful lookout" so she could slow, stop or swerve, "evidence must be presented that the plaintiff had the means and ability to avoid the collision by doing each act described…." *Gardner v. Reynolds*, 775 S.W.2d 173, 178 (Mo. App. 1989). *Accord*, *Hayes v. Price*, 313 S.W.3d 645, 649-652 (Mo. 2010) ("The inquiry is two-fold: if the driver was keeping a careful lookout, could the driver have seen the danger; and, if the driver could have seen the danger, did the driver have the ability to take some precautionary measure….The evidence must support a finding that a driver had the means and ability to have avoided the collision.")

In the absence of evidence of causation, facts upon which its affirmative defenses depend, it would be improper for State Farm to suggest to the jury issues of "excessive speed," "following too closely," or failure to keep a "careful lookout."

        Respectfully submitted,

By:  /s/ Edward M. Roth
_____
Anthony S. Bruning, #30906MO
Ryan L. Bruning, #62773MO
Anthony S. Bruning Jr., # 60200MO
Edward M. Roth, #37294MO
The Bruning Law Firm, L.L.C.
555 Washington Ave., Ste. 600
St. Louis, MO 63101
(314) 735-8100
(314) 735-8020
ryan@bruninglegal.com
tony@bruninglegal.com
aj@bruninglegal.com
eroth@bruninglegal.com
*Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of September 2017, the foregoing and exhibits identified and attached hereto were filed electronically with the Court Clerk using the Court's EMF filing system and that the filings were served on all parties by the Court's electronic filing system.

By:  /s/Edward M. Roth

18